237

# DEPARTMENT OF DEFENSE

# OFFICE OF COMPLAINT INVESTIGATIONS

## TESTIMONY OF MONROE A. MAJOR

Taken on

January 30, 2002

U.S. Army Engineer District - Baltimore

Baltimore, Maryland

For The Record, Inc.
Waldorf, Maryland 20602
(301) 870-8025

Exhibit 6

242

1   audited. And when the recommended audits were presented
2   to General Ballard, I was told -- I was not at that
3   meeting -- that he said, "A GS-9 in Baltimore. That's
4   not too high." And then someone told him that that was
5   the deputy's secretary. He said, "What's the commander's
6   secretary's grade" and he was told a GS-10. He said,
7   "Well add that -- add that to the audit list."
8       Q.   Did he know who occupied that position?
9       A.   I have no idea. I didn't know. I doubt that
10  he did. I don't know why he would. But --
11      Q.   Okay. So then what happened?
12      A.   Well then the IG teams were tasked to do all
13  these audits throughout the Corps. And they did so and
14  came back with their reports.
15      Q.   Okay. And then what happened?
16      A.   The IG team leader and a team leader from my
17  office, who is no longer with the Corps of Engineers,
18  went through all the results and identified those that
19  looked out of alignment. Not necessarily wrong, just not
20  aligned well with the others. Because there were so many
21  outside auditors that did not know the corps, that that

1  review had to be conducted.
2          And then three of us, myself, Millie Edwards,
3  and Arlene Sambrano, who was one of the leaders of the
4  team, reviewed all those that had been selected that way,
5  and compared them against classification standards.
6          A few were changed. I don't remember exactly
7  how many, but a few were changed from the recommendation
8  of the actual auditor. Probably ten - 12, in that range.
9  The two in Baltimore, two secretaries, were two of those.
10     Q.   Okay. Who actually -- I'm sorry. Are you
11 familiar with who actually reviewed the two positions in
12 Baltimore?
13     A.   You mean at that time?
14     Q.   Yes. During this process that you were talking
15 about.
16     A.   It was -- I don't recall. We all talked about
17 them and we all talked -- the three people did them all.
18 But one person would review positions and then discuss it
19 with the other two, and I don't recall. I just don't
20 recall which one of us actually did that.
21     Q.   So this was like a panel?

1  A. Yes.

2  Q. And there were three members of the panel?

3  A. Yes. Three classifiers.

4  Q. Okay. And I had gotten testimony earlier that
5 there were 205 positions that were sent to your office.
6 Is that --

7  A. That may be. I'm not sure at this point.

8  Q. Okay. But there was --

9  A. But we do not, as a panel, review that many.
10 There was a preliminary screening of those that were --
11 there was agreement that the finding was valid and we did
12 not review those.

13  Q. Now the testimony I got from Ms. Clemens from
14 the IG office was that the initial classification or the
15 initial recommendation by the contract classifier from
16 the IG office was that the three positions at the Corps
17 of Engineers, Baltimore were appropriately classified.

18  A. Yes. That's right.

19  Q. Okay. So then your panel then reviewed those
20 three positions?

21  A. I recall two. I don't recall a third one.

245

1    Q.   Okay.  You don't recall a third one.  And so
2 the panel disagreed with the classification of the two
3 positions?
4    A.   Of the two positions.  That's correct.
5    Q.   Do you know why?
6    A.   As a matter of comparison with the
7 classification standard for the 318 series, we felt that
8 the contract auditor had over credited some of the
9 factors in that standard.
10        Also, and I think I should point this out, that
11 the job was two grades higher than most district
12 secretaries, commanders' secretaries, and was the only
13 ten in the Corps of Engineers at the district level,
14 which raised a question of supportability.
15   Q.   Okay.  Now Ms. Haught's position was originally
16 classified at the nine level and then bumped up, if you
17 will, one grade based on person in the job.
18   A.   That's correct.
19   Q.   Okay.  Was that taken into consideration?
20   A.   Yes, it was.  And when we rated the job, the
21 basic grade came out as an eight, and as district

246

1  secretaries do, that's just how they -- they come out.
2  And we added one grade for the same reason.
3       Q.   So you still took into consideration --
4       A.   Oh, yes.
5       Q.   -- the person in the job?
6       A.   The person in the job and her gradability, and
7  contacts, and we added a grade because of that.
8       Q.   Okay.  You said that her position is the only
9  -- was the only or is the only ten?
10      A.   Still is the only ten.
11      Q.   Ten in the organization.
12      A.   At the district level.
13      Q.   At the district level.
14      A.   Of course, the commander at USACE.
15      Q.   I'm sorry.  At the district level.
16      A.   Most of our divisions, which is one level
17 higher, I think maybe all of them have GS-9 secretaries.
18 So this is even a grade higher than the district
19 commander's boss' secretary, generally.
20      Q.   Okay.  So then a decision was made that the job
21 was to be downgraded.

247

1  A.  That's correct.
2  Q.  Both positions.
3  A.  Correct.
4  Q.  Okay. And then what happened?
5  A.  That action was taken. General Ballard
6  directed the action and it was taken. Then later, due to
7  Congressional interest, the Army's Civilian Personnel
8  Evaluation Agency was tasked to audit those two jobs
9  again --
10 Q.  CPEA?
11 A.  CPEA.
12 Q.  Okay. So then what happened?
13 A.  They re-audited the two positions and
14 determined that they should be respectively a ten and a
15 nine.
16     And then the downgrade actions were -- were
17 canceled. Therefore, there was no -- no period of actual
18 being downgraded. It wasn't they were upgraded again.
19 It was just the action was canceled.
20 Q.  Given the fact that she's the only ten then in
21 the district, and that the commander's secretary is lower

248

1 graded?
2   A.  I'm sorry.  What?
3   Q.  Okay.  Is the commander's secretary lower
4 graded?
5   A.  Commander of the district?
6       MS. HAUGHT:  General Ballard.
7       THE INVESTIGATOR:  General Ballard's --
8       THE WITNESS:  Oh, no.  No.  Certainly not.  I'm
9 saying at the district.
10      BY THE INVESTIGATOR:
11  Q.  I'm sorry.  I thought you said -- at the
12 district.
13  A.  Yes.
14  Q.  She's the highest at the district.
15  A.  At the district.  And she's one grade higher
16 than the division commander's secretary.
17  Q.  And the division --
18  A.  Is in New York.
19  Q.  Is in New York.  And in the scheme of things,
20 in the hierarchy --
21  A.  It's one level higher.

For The Record, Inc.
Waldorf, Maryland 20602
(301)870-8025

249

1    Q.   Higher than the Baltimore district.
2    A.   And it's occupied by a general.
3    Q.   Okay.  And his secretary is?
4    A.   A nine.
5    Q.   A nine.  Lower.
6         Given all of that, why did the agency go along
7    with what CPEA --
8    A.   Well CPEA is the agency.
9    Q.   Okay.
10   A.   And once that decision was made and we were
11   directed by the Deputy Assistant Secretary of the Army to
12   cancel the action, of course, we did so.  We're good
13   soldiers.
14   Q.   Moving back to the initial -- to the downgrade,
15   the initial decision to downgrade, are employees given
16   appeal rights?
17   A.   Oh, yes.  And both of the incumbents in these
18   positions were given their appeal rights in writing and
19   in person, or I was told that.
20   Q.   When you talk about appeal rights, what are the
21   appeal rights?  Do you know?